UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANNE MARIE TAYLOR,

                       Plaintiff,            Civil Action No. 17-11444
                                        Honorable Robert H. Cleland
                                        Magistrate Judge David R. Grand

v.

ACTING COMMISSIONER
NANCY A. BERRYHILL,

                       Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [14, 15]

Plaintiff Anne Marie Taylor ("Taylor") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [14, 15], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.      RECOMMENDATION

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Taylor is not disabled under the Act. Accordingly, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [15] be GRANTED, that Taylor's Motion for Summary Judgment [14] be DENIED, and that pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision be AFFIRMED.

## II.    REPORT

### A.    Procedural History

On January 16, 2014, Taylor filed an application for DIB, alleging a disability onset date of June 28, 2013.  (Tr. 67, 79, 136, 157).  This application was denied at the initial level.  (Tr. 79).  Taylor filed a timely request for an administrative hearing, which was held on September 28, 2015, before ALJ Andrew G. Sloss.  (Tr. 44-65).  Taylor, who was represented by attorney Lisa Watkinson, testified at the hearing, as did vocational expert ("VE") Pauline A. McEachin. (*Id.*).  On October 27, 2015, the ALJ issued a written decision finding that Taylor is not disabled under the Act.  (Tr. 19-39).  On March 16, 2017, the Appeals Council denied review.  (Tr. 1-6). Taylor timely filed for judicial review of the final decision on May 5, 2017.  (Doc. #1).  The parties filed cross-motions for summary judgment (Docs. #14, #15), and Taylor filed a reply. (Doc. #16).

### B.    Framework for Disability Determinations

Under the Act, DIB are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

   **C.    Background**

       *1.    The Record*

   Taylor alleges disability as a result of depression, bilateral carpal tunnel syndrome, left shoulder mumford and subacromial decompression, knee problems, severe asthma, and hip dysplasia.  (Tr. 66, 161).  At the time of the administrative hearing, Taylor was sixty years old and had not worked since her alleged onset date of June 28, 2013.  (Tr. 48).  She previously worked as a health services coordinator.  (Tr. 49, 175).  At this job, her duties included developing and implementing the "Head Start & Early Head Start Service Plans"; preparing reports, developing curricula, providing staff trainings, and participating at meetings and workshops; showing teachers which health forms to use and how to do CPR; setting up clinics that do physicals and immunizations; coordinating the delivery of follow-up treatments;

conducting health screenings (for vision and hearing) on children ages zero to five; and ordering medical instruments and supplies.  (*Id.*).

The Court has thoroughly reviewed the record in this matter, including Taylor's medical record, Function Report, Disability Reports, and testimony as to her conditions and resulting limitations.  Instead of summarizing that information here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

2.    *Vocational Expert's Testimony*

Pauline A. McEachin testified as an independent VE at the administrative hearing.  (Tr. 62-65, 220-21).  The ALJ found that Taylor's only past relevant employment was as a health services coordinator.  (Tr. 62).  When he asked the VE to elaborate on this job, the VE gave the following testimony:

> A:  Your honor, per the [Dictionary of Occupational Titles ("DOT")] I'll give you the DOT number.
>
> Q:  Okay.
>
> A:  The closest DOT I can identify is 169.167-018.  Per the DOT it's classified as sedentary and it is skilled with [Specific Vocational Preparation ("SVP")] of 6.
>
> Q:  Okay.  And what would the DOT title be?
>
> A:  It is – the title is Contact Representative.

(*Id.*).

The ALJ then asked the VE to imagine a hypothetical individual of Taylor's age, education, and work experience who could perform medium work except that she must avoid concentrated exposure to respiratory irritants and is limited to frequent reaching and handling.  (Tr. 63).  The VE testified that the individual could perform Taylor's past work.  (*Id.*).

Next, the ALJ asked the VE to imagine a hypothetical individual of Taylor's age,

education, and work experience who could perform light work but must avoid concentrated exposure to respiratory irritants and is limited to frequent reaching and handling. (*Id.*). The VE testified that this individual could also perform Taylor's past work. (*Id.*). But the VE testified that the individual could not perform this job if the individual was further limited to occasional handling and fingering. (*Id.*). Similarly, the VE testified that the individual could not perform Taylor's past work if the individual was only limited to simple tasks and unskilled-type work. (Tr. 64). This last limitation would also eliminate any transferrable skills. (Tr. 65).

The VE testified that employers customarily tolerate no more than one absence per month and no more than a total of eight absences in a twelve-month period. (Tr. 63). As a result, the VE testified that if the individual was absent from work more than two times per month on a regular basis due to symptoms and medication side effects, the individual would be "unemployable." (Tr. 63-64).

The VE testified that her testimony was consistent with the DOT, except for the portion on absenteeism, which was based on her professional experience because absenteeism isn't covered by the DOT. (Tr. 64).

### D.    The ALJ's Findings

At Step One of the five-step sequential analysis, the ALJ found that Taylor has not engaged in substantial gainful activity since June 28, 2013, the alleged onset date. (Tr. 24). Next, the ALJ found that Taylor has the severe impairments of degenerative disc disease, osteoarthritis and degenerative changes to the right foot and shoulder, and asthma. (*Id.*). At Step Three, the ALJ found that Taylor's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (Tr. 27).

The ALJ then found that Taylor retains the residual functional capacity ("RFC") to

perform light work except that she is further limited to work requiring no more than frequent handling and fingering and that avoids concentrated exposure to respiratory irritants. (Tr. 28).

At Step Four, the ALJ concluded that Taylor is capable of performing her past relevant work as a health service coordinator. (Tr. 33). As a result, the ALJ concluded that Taylor was not disabled under the Act from June 28, 2013 through October 27, 2015, the date of the ALJ's decision. (Tr. 33-34).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486

F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'").

**F.    Analysis**

In her summary judgment motion, Taylor argues that the ALJ erred by:  (1) failing to include functional limitations in the RFC regarding Taylor's social functioning and

concentration, persistence, and pace[1]; (2) identifying past relevant work that Taylor did not perform, and not analyzing her past relevant work as a composite job at Step Four; and (3) improperly discounting the opinion of Taylor's treating physician, Kenneth Steibel, M.D., based on a finding that her condition had not worsened since when she was working.

> ### 1.   The ALJ Did Not Err by Failing to Include Functional Limitations Regarding Social Functioning and Concentration, Persistence, and Pace in the RFC

Taylor argues that the ALJ's omission of her mental limitations regarding social functioning and concentration, persistence, and pace from the RFC "was a significant legal error." (Doc. #14 at 9).  The Court disagrees.

At Step Two, the ALJ concluded that Taylor's "medically determinable mental impairment of mixed emotions of adult life . . . does not cause more than minimal limitation in [her] ability to perform basic mental work activities and is therefore non-severe."  (Tr. 26).  In making this finding, the ALJ considered the four broad functional areas known as the "paragraph B" criteria.  (*Id.*).  As to the second functional area – social functioning – the ALJ concluded that Taylor has mild limitation.  (*Id.*).  The ALJ also determined that Taylor has mild limitation with respect to the third functional area:  concentration, persistence, and pace.  (*Id.*).

Taylor argues that "the ALJ's RFC finding was defective because it failed to in any way account for [these two] proven mental functional limitations."  (Doc. #14 at 9).  She explains that

> [t]his issue has nothing to do with how the ALJ weighed the medical evidence or what medical opinions and other facts were considered. Rather, the issue is solely whether the ALJ's finding of at least some

---

[1] This argument's heading indicates that Taylor also takes issue with the ALJ's alleged failure to account for Taylor's functional limitations as to social functioning and concentration, persistence, and pace in his hypothetical questions to the VE.  (Doc. #14 at 7).  However, as explained below, Taylor makes clear that her claim of legal error is based on the ALJ's alleged failure to include these limitations in the RFC.  Thus, the Court will focus on Taylor's argument regarding the RFC, which she has indicated is the "sole[]" issue before the Court.  (*Id.* at 8 n.1).

> degree of mental functional limitation was accounted for in the RFC finding.  Because the ALJ failed to include any mental functional limitations in his RFC finding, that finding was defective as a matter of law . . . .

(*Id.* at 8 n.1).

RFC is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs" on a regular and continuing basis.  *Cohen v. Sec'y of Health & Human Servs.*, 964 F.2d 524, 530 (6th Cir. 1992) (internal quotations omitted).  It is a medical assessment of what an individual can do in a work setting in spite of functional limitations and environmental restrictions imposed by all of her medically determinable impairments, including those that are non-severe.  *See* 20 C.F.R. § 404.1545.

As the Sixth Circuit has recognized, in determining an individual's RFC, "[o]nce one severe impairment is found, the combined effect of all impairments must be considered, even if other impairments would not be severe."  *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787 (6th Cir. 2009); *see also* 20 C.F.R. § 404.1523 ("In determining whether your physical or mental impairment or impairments are of a sufficient medical severity . . . we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process."); 20 C.F.R. § 404.1545(a)(2) ("*If you have more than one impairment.*  We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity." (emphasis in original)).  Moreover, Social Security Ruling ("SSR") 96-8p provides that

9

> [i]n assessing RFC, the adjudicator must consider limitations and
> restrictions imposed by all of an individual's impairments, even those that
> are not "severe."  While a "not severe" impairment(s) standing alone may
> not significantly limit an individual's ability to do basic work activities, it
> may – when considered with limitations or restrictions due to other
> impairments – be critical to the outcome of a claim.  For example, in
> combination with limitations imposed by an individual's other
> impairments, the limitations due to such a "not severe" impairment may
> prevent an individual from performing past relevant work or may narrow
> the range of other work that the individual may still be able to do.

SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996).  In summary, once the ALJ determined that

Taylor suffers from severe physical impairments – including degenerative disc disease,

osteoarthritis and degenerative changes to the right foot and shoulder, and asthma – he was

required to consider these impairments in combination with all non-severe impairments,

including Taylor's medically-determinable mental impairment of mixed emotions of adult life, in

assessing her RFC.  *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 190-91 (6th Cir.

2009).

But as the Commissioner points out, "other courts in this district and circuit have rejected

arguments similar to [Taylor's], finding that mild limitations in the paragraph B criteria do not

always require corresponding limitations in the RFC."  (Doc. #15 at 8) (citing *Caudill v. Comm'r

of Soc. Sec.*, No. 2:16-cv-818, 2017 WL 3587217, at *6 (S.D. Ohio Aug. 21, 2017); *Burrell v.

Comm'r of Soc. Sec.*, No. 14-14529, 2016 WL 1165994, at *10 (E.D. Mich. Feb. 29, 2016)).

Indeed, "courts in this district have found that 'mild limitations do not require incorporation into

an RFC assessment.'"  *Shamsud-Din v. Comm'r of Soc. Sec.*, No. 16-cv-11818, 2017 WL

3574694, at *6 (E.D. Mich. July 24, 2017) (internal citations omitted); *Caudill*, 2017 WL

3587217, at *6 ("[T]he ALJ's determination that [the plaintiff] had some mild impairment does

not *require* inclusion of mental limitations into the RFC. . . . Severe or non-severe, an ALJ need

only include limitations arising from an impairment where the impairment affects a claimant's

ability to work." (emphasis in original) (internal citations omitted)).  This is because "a Step Two analysis is distinct from an ALJ's obligation to consider the impact of Plaintiff's non-severe impairments in addition to and in conjunction with Plaintiff's severe impairments in assessing Plaintiff's RFC."  *Harvey v. Berryhill*, No. 3:15-CV-440-CCS, 2017 WL 3033070, at *7 (E.D. Tenn. July 17, 2017) (quoting *Katona v. Comm'r of Soc. Sec.*, No. 14-CV-10417, 2015 WL 871617, at *6 (E.D. Mich. Feb. 27, 2015)); *Fellows v. Comm'r of Soc. Sec.*, No. 1:14-cv-506, 2015 WL 4134699, at *6 (W.D. Mich. July 8, 2015) (quoting *Pinkard v. Comm'r of Soc. Sec.*, No. 1:13-cv-1339, 2014 WL 3389206, at *10 (N.D. Ohio July 9, 2014)); (Tr. 27) ("The limitations identified in the 'paragraph B' criteria are not a [RFC] assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.").  "Therefore, a finding by the ALJ that the Plaintiff has mild limitations in the areas of . . . social functioning, and concentration, persistence, or pace, does not necessarily mean that the Plaintiff will have corresponding limitations with regard to her RFC."  *Ceol v. Berryhill*, No. 3:15-CV-315-CCS, 2017 WL 1194472, at *10 (E.D. Tenn. Mar. 30, 2017) (citing *Pinkard*, 2014 WL 3389206, at *10).  "Courts in this district have also found, however, that an ALJ's failure to explain how a claimant's mild psychological limitations affect the RFC assessment may constitute reversible error where the ALJ makes no mention of the claimant's mental impairments in the RFC analysis."  *Shamsud-Din*, 2017 WL 3574694, at *6 (internal citations omitted).

Here, remand is not warranted because the ALJ considered Taylor's non-severe mental impairment in the RFC analysis.  The ALJ reviewed the mental assessment by State Agency psychological consultant Ashok Kaul, M.D., "which deemed [Taylor's] alleged mental impairment to be non-severe in nature," and gave it "great weight because it remains consistent

with the record as a whole." (Tr. 32, 72). In addition, the ALJ referenced Taylor's psychological treatment notes – in particular, her global assessment of functioning ("GAF") score of eighty-five in December 2014 and her GAF score of fifty in January 2015. (Tr. 33). The ALJ noted that her treatment notes indicated that her GAF score improved to eighty-five in December 2014 "with the benefit of treatment." (*Id.*). He explained his reasoning for giving "greater weight" to the former score, while giving "little weight" to the latter score: the former score was found to be "consistent with the mild nature of [Taylor's] mental impairment in the presence of appropriate treatment," while the latter score "was preceded by a lapse in treatment, and with evidence indicating that the claimant's prognosis is 'good' there is no basis to assert that the claimant would not improve with resumption of treatment." (*Id.*).

In her motion, Taylor cites to authorities that require an ALJ to merely *consider* the functional effects of non-severe impairments when formulating an RFC. (Doc. #14 at 8) (citing 20 C.F.R. §§ 404.1523, 404.1545(a)(2); SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996)). But Taylor misconstrues these authorities as requiring an ALJ "to account for" functional limitations caused by non-severe impairments by *including* at least some particular mental functional limitation in the RFC. (*Id.*). Moreover, Taylor cites to *Kich v. Colvin*, 218 F. Supp. 3d 342 (M.D. Pa. 2016), in support of her argument that the ALJ's alleged mistake constitutes a basis for remanding the case. Yet *Kich*, which is from outside of this district and outside of this circuit, is non-binding on the Court. As explained above, case law from this district establishes that the ALJ was not required to incorporate any particular functional limitation in the RFC based on his Step Two findings of mild limitations in social functioning and concentration, persistence, and pace. *See Burrell*, 2016 WL 1165994, at *10 (finding that "the ALJ did not err by not incorporating plaintiff's 'mild limitations' . . . into the RFC" because "this Court has concluded

that mild limitations do not require incorporation into an RFC assessment" (citing *Boley v. Astrue*, No. 11-10896, 2012 WL 680393, at *14 (E.D. Mich. Feb. 10, 2012)).  The ALJ was merely required to consider Taylor's mental limitations in formulating the RFC.  He clearly did this here.  Thus, remand as to this issue is not appropriate.[2]

### 2.   The ALJ did not Err in his Analysis of Taylor's Past Relevant Work

Taylor argues that the ALJ erred by finding that she was not disabled at Step Four because she never worked as a Contact Representative and because her past relevant work as a health services coordinator was actually a composite job, which must be considered "as actually performed" (not "as generally performed").  (Docs. #14 at 10-11; #16 at 1-4).  This argument lacks merit.

At the administrative hearing, the ALJ found that Taylor's only past relevant employment was as a health services coordinator.  (Tr. 62).  As detailed above, the VE provided the following testimony regarding this job:

> A:  Your honor, per the DOT I'll give you the DOT number.
>
> Q:  Okay.
>
> A:  The closest DOT I can identify is 169.167-018.  Per the DOT it's classified as sedentary and it is skilled with SVP of 6.
>
> Q:  Okay.  And what would the DOT title be?
>
> A:  It is – the title is Contact Representative.

(*Id.*).  Based on the VE's testimony, the ALJ concluded at Step Four of the sequential evaluation

---

[2] Taylor argues that the ALJ's failure to account for her mild limitations in the RFC is not harmless error because the ALJ's denial "is premised upon [Taylor] being able to perform skilled SVP 6 [past relevant work] which was intensely social."  (Doc. #14 at 9).  But Taylor cites to no cases, regulations, or rulings indicating that this merits remanding the case.  If her reference to *Kich*, 218 F. Supp. 3d 342, was meant to support this argument, again, that case is not binding on this Court.  Regardless, Taylor's argument does not alter the Court's conclusion that the ALJ committed no error because he was not required to incorporate her mild limitations into the RFC.

that Taylor is capable of performing her past relevant work as a health services coordinator "as generally performed." (Tr. 33). As a result, the ALJ concluded that Taylor was not under a disability from June 28, 2013 through the date of his decision. (*Id.*).

As this court has previously explained:

> At Step Four, a claimant is generally found disabled where he can return to his past work either as it was actually performed or as that position is generally performed in the national economy. SSR 82-61, 20 C.F.R. § 404.1560(b)(2). However, where a claimant's past relevant work is a "composite job," which has "significant elements of two or more occupations" and for which there is no equivalent in the DOT, his ability to return to that unique work situation must be "evaluated according to the particular facts of each individual case." SSR 82-61. Likewise, the Program Operations Manual System ("POMS"), a non-binding handbook produced for internal use at the Social Security Administration,[3] provides that "[a] composite job will not have a DOT counterpart, so do not evaluate it at the part of step 4 considering work 'as generally performed in the national economy.'" POMS § DI 25005.020. A claimant is only capable of performing a past relevant composite job if he can perform each of the separate components of the position. *Hansen v. Comm'r of Soc. Sec.*, No. 13-13348, 2014 WL 5307133, at *8 (E.D. Mich. Oct. 16, 2014).

*Comeau v. Comm'r of Soc. Sec.*, No. 15-10650, 2016 WL 1253315, at *9 (E.D. Mich. Mar. 30, 2016).

The DOT defines Contact Representative as being within the government services industry and having the following duties:

> Provides information and assistance to public on government agency programs and procedures: Explains regulations, agency policies, form completion procedures, and determinations of agency to advise individuals regarding obtainment of required documents and eligibility requirements for receiving benefits. Analyzes applications and information for benefits, privileges, or relief from obligations, using knowledge of rules, regulations, and precedent decisions to determine qualifications for benefits and privileges or liability for obligations. Investigates errors or delays in processing of applications for benefits and initiates corrective action. May be designated according to title of agency represented.

---

[3] Although POMS has no legal force and is not controlling, it is "nevertheless persuasive." *See Davis v. Sec'y of Health & Human Servs.*, 867 F.2d 336, 340 (6th Cir. 1989).

DOT 169.167-018.

Taylor argues that because the VE said Contact Representative was the "closest" DOT job she could find, the VE's testimony does not establish that Taylor's past relevant work was actually that of a Contact Representative.  (Doc. #14 at 11-12).  Moreover, Taylor interprets this portion of the VE's testimony as indicating that her past relevant work was a composite job. Taylor lists various duties/elements that she believes are "not captured" by the DOT position of Contact Representative, which include:

- Hands-on teaching regarding how to perform CPR and other emergency medical procedures;

- Conducting health screenings on children;

- Preparing age-appropriate health curricula for school children;

- Planning, coordinating, and training fellow staff members; and

- Ordering and maintaining stocks of medical instruments and supplies.

(*Id.* at 12).

Taylor states:  "In short, while [her] [past relevant work] had certain similarities with the job of Contact Representative, many of [its] main duties . . . are not captured by that single <u>DOT</u> job description.  That is the very essence of a composite job."  (*Id.* at 12-13) (emphasis in original).  She argues that because her past relevant work as a health services coordinator was actually a composite job, the ALJ was "barred from issuing a [S]tep 4 as generally denial."  (*Id.* at 10).  Taylor argues that, in doing so, the ALJ "ignored and violated the composite job rule" laid out in SSR 82-61 and POMS § DI 25005.020.  (*Id.* at 11).

Although Taylor lists job duties not explicitly listed in the DOT for Contact Representative, she does not specify what other DOT jobs should have been considered by the VE and the ALJ – in other words, what other specific jobs would have made Taylor's past

relevant work "composite." Courts have found that "a plaintiff may be considered to have performed a composite job" where "the main duties of past relevant work can only be described by considering multiple DOT occupations." *Tipton v. Comm'r of Soc. Sec.*, No. 2:14-cv-1209, 2015 WL 3505513, at *8 (S.D. Ohio June 3, 2015) (internal quotation omitted). Taylor does not point to any additional occupations that should have been considered. Nor does she point to any discrepancy between the functional limitations required by (1) her past relevant work and the Contact Representative job, and (2) both of these jobs and the RFC. For example, Taylor does not assert that she used to lift more than twenty pounds when performing her past relevant work, whereas a Contact Representative is limited to lifting only twenty pounds. Importantly, Taylor does not argue that either of these jobs involve functional requirements that exceed or are not properly reflected in the RFC. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) (noting that the plaintiff bears the burden of proving the existence and severity of the limitations caused by her impairments through Step Four).

Moreover, in her motion, Taylor's request for remand on this issue lacks any reference to case law or administrative rulings or regulations. Rather, her request highlights the "corrective role" of the Court, and is based on "the important purpose [remand would serve] of making sure that other meritorious cases in the future of a similar type are not improperly denied." (Doc. #14 at 13). Meanwhile, the Commissioner argues that (1) Taylor's arguments as to her past relevant work are waived because she failed to object to the VE's testimony at the hearing; and (2) it was appropriate for the ALJ to rely on the VE's testimony where the VE did not say that Taylor's past relevant work was a composite job. (Doc. #15 at 11). The Court finds the Commissioner's arguments persuasive given that they are supported by recent case law. *Gillman v. Comm'r of Soc. Sec.*, No. 2:16-cv-731, 2017 WL 3301576, at *7, *report and recommendation adopted*, 2017

WL 4296313, at *5 (S.D. Ohio Sept. 28, 2017); *Hurley v. Comm'r of Soc. Sec.*, No. 1:13-cv-913, 2015 WL 954192, at *12 (S.D. Ohio Mar. 3, 2015); *see Leeson v. Comm'r of Soc. Sec.*, No. 2:14-cv-335, 2015 WL 5358891, at *16 (S.D. Ohio Sept. 14, 2015).

Taylor's reply focuses exclusively on responding to the Commissioner's two arguments, yet she cites to no valid case law[4] to rebut them.  In particular, Taylor argues that "[t]here is absolutely no rule of law whatsoever . . . that a claimant needs to object to **<u>favorable</u>** testimony," which means that here, "[t]here was no need [for her] to object to testimony from the VE which in its entirety eliminated the possibility of the ALJ issuing a step 4 as generally denial."  (Doc. #16 at 2, 4) (emphasis in original).  In addition, Taylor states that "[t]he Agency makes much of the fact that the VE never specifically said the words that [her] prior work was a composite job" and argues that this is "both misleading and meaningless" because VEs "cannot testify as to legal conclusions."  (*Id.* at 4).  She argues that "the presence of a composite job" is established by the VE's own testimony and Taylor's description of her prior work, "both of which are unrebutted." (*Id.*).  For the reasons explained above, these arguments presented by Taylor in her reply are unavailing.  Taylor has not made a proper showing that the ALJ erred at Step Four and in his evaluation of her past relevant work.  Thus, remand as to this issue is not warranted.

### 3.      The ALJ did not Violate the Treating Physician Rule

On February 18, 2015, Dr. Steibel filled out a medical source statement.  (Tr. 366-69). He indicated that Taylor's impairments affect her ability to lift/carry, stand and/or walk, sit, and push and/or pull.  (Tr. 366-67).  More specifically, Dr. Steibel opined that Taylor's multi-level degenerative discs with stenosis, separated left shoulder, and urinary incontinence limited her to occasionally lifting and/or carrying less than ten pounds and frequently lifting and/or carrying

---

[4] The only case Taylor cites to in her entire reply brief is from outside this district:  *Wright v. Sullivan*, 900 F.2d 675, 684 (3d Cir. 1990).  (Doc. #16 at 2).

less than ten pounds.  (Tr. 366).  He also opined that Taylor's multi-level degenerative discs with stenosis, osteoarthritis in her feet and ankles, and urinary incontinence limited her to standing and/or walking less than two hours in an eight-hour workday.  (*Id.*).  He marked a box indicating that Taylor must periodically alternate sitting and standing to relieve pain or discomfort.  (Tr. 367).  In addition, he found that Taylor's separated left shoulder, bilateral carpal tunnel, multi-level degenerative discs with stenosis, possible nerve damage, and osteoarthritis limited her to limited pushing and/or pulling in both the upper and lower extremities.  (*Id.*).

As for postural activities, Dr. Steibel opined that Taylor could occasionally climb ramps or stairs and never kneel or crawl; he indicated no limitations as to her ability to balance, crouch, and stoop.  (*Id.*).  He further opined that Taylor's manipulative functions – reaching all directions (including overhead), handling (gross manipulation), fingering (fine manipulation), feeling (skin receptors) – were limited due to her separated left shoulder, bilateral carpal tunnel, and multilevel disc degeneration with stenosis.  (Tr. 368).

With respect to visual/communicative limitations, Dr. Steibel found that while Taylor's ability to see and hear were unlimited, her ability to speak was limited by asthma, which causes coughing and difficulty breathing.  (*Id.*).  Finally, as for environmental limitations, Dr. Steibel opined that Taylor had no limitations regarding noise, but that her asthma caused environmental limitations with regards to temperature extremes (cold), dust, humidity/wetness, fumes, odors, chemicals, and gases.  (Tr. 369).  In addition, Taylor's multi-level degenerative disease, bilateral carpal tunnel, and osteoarthritis limited her with regards to vibration and hazards such as machinery and/or heights.  (*Id.*).

Taylor argues that the ALJ's "sole reason" for "rejecting" Dr. Steibel's opinion "was that [Taylor's] impairments were longstanding and that there was no evidence of worsening."  (Doc.

#14 at 14).   In Taylor's view, this reason "is simply incorrect" because in reality, "[her] conditions had worsened as confirmed by objective diagnostic and clinical evidence." (*Id.*).   The Court finds that the ALJ did not err in his evaluation of Dr. Steibel's opinion.

"Generally, the opinions of treating physicians are given substantial, if not controlling, deference," but they "are only given such deference when supported by objective medical evidence." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (citing *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) and 20 C.F.R. § 404.1527(d)(2)).   Thus, an ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley*, 581 F.3d at 406 (internal quotations omitted); SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).   However, it is "error to give [a treating source] opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole.   SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996).   Accordingly, "the Sixth Circuit has held that '[a]n [ALJ] may give more weight to the opinions of examining or consultative sources where the treating physician's opinion is not well-supported by the objective medical records.'" *Kilkolski v. Comm'r of Soc. Sec.*, No. 14-cv-14700, 2016 WL 6080217, at *9 (quoting *Dyer v. Soc. Sec. Admin.*, 568 F. App'x 422, 428 (6th Cir. 2014)), *report and recommendation adopted*, 2016 WL 1357900, at *6 (E.D. Mich. Apr. 5, 2016).

If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, considering a number of factors, including the "length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record

as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2) (establishing that the ALJ must "give good reasons" for the weight given to a treating source opinion)). "Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion' – not an exhaustive factor-by-factor analysis." *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). Ultimately, "[t]his procedural 'good reason' rule serves both to ensure adequacy of review and to permit the claimant to understand the disposition of his case." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550-51 (6th Cir. 2010) (citing *Rogers*, 486 F.3d at 242). That a treating physician's opinion is inconsistent with the record constitutes a "good reason" for not giving controlling weight to it. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 417-18 (6th Cir. 2011).

Here, the ALJ specifically considered Dr. Steibel's opinion, evaluating it as follows:

> The medical source statement proffered by Kenneth Steibel, M.D., the claimant's treating physician, which deemed the claimant incapable of sustaining even a significantly limited range of sedentary work, is given little weight because while it is true that opinions from treating sources are based on a unique relationship over a longitudinal period of time, in the instant case, the objective findings with regard to orthopedic function and the longstanding nature of the claimant's impairments even prior to her alleged onset date without significant evidence of worsening all support the assertion that the claimant is not as limited as opined by Dr. Steibel (Exhibit 11F).

(Tr. 32-33). In other words, the ALJ gave little weight to Dr. Steibel's opinion because (1) that opinion was inconsistent with objective findings as to orthopedic function; and (2) Taylor's impairments had been "longstanding" – even prior to her alleged onset date – without significant

evidence of worsening.  Thus, contrary to Taylor's argument, the ALJ gave two reasons – not one – for giving Dr. Steibel's opinion little weight.[5]  (Doc. #15 at 13-14).

The ALJ's first reason is supported by substantial evidence.  The record shows that Taylor's orthopedic functioning was not as limited as Dr. Steibel indicated.  Prior to her alleged onset date, on January 9, 2012, she saw A. George Dass, M.D., with a complaint of triggering and pain in her right thumb for two months.  (Tr. 253).  But upon physical examination her sensation was intact to light touch, her deep tendon reflexes were intact and within normal limits, her coordination tests were normal, and she had no abnormal swelling, varicosities, edema, or tenderness. (Tr. 254).  Her gait was normal.  (*Id.*).  An examination of her spine, ribs, and pelvis had the following results:  no swelling, masses, or erythema on inspection; range of motion had full flexion, extension, and rotation; normal stability; and strength/tone was 5/5 with good tone. (*Id.*).  Practically the same results[6] were found upon examination of her left upper extremity (shoulder, elbow, hand/wrist) and right upper extremity (shoulder and elbow, but not hand/wrist because of the issues with her right thumb).  (Tr. 254-56).  In March 2012, Taylor went to the emergency room for asthma, but her review of systems indicates that she had no muscle aches or calf pain.  (Tr. 260).  Upon physical examination, her back had normal inspection, her extremities exhibited normal range of motion, she had no lower extremity edema, and she had no motor deficit.  (Tr. 261-62).  The March 3, 2012 discharge note says that she had no difficulty with ambulating and was in no acute distress.  (Tr. 262).  In subsequent medical records from August 16, 2012, January 16, 2013, and May 8, 2013, Taylor's review of systems was mostly

---

[5] Taylor does not challenge this interpretation of the ALJ's analysis in her reply.  (Doc. #16). Indeed, her reply omits any mention of Dr. Steibel's opinion.  (*Id.*).

[6] These other results varied only in that they found that inspection and range of motion were "normal," and the examinations of both elbows did not include evaluating their range of motion. (Tr. 254-56).

"unremarkable" and did not include musculoskeletal complaints, and her extremities were found to have no edema.  (Tr. 278-79, 281).  On the second of these three dates, she was exercising and was advised to continue doing so on a regular basis.   (Tr. 279).

After Taylor's alleged onset date, on August 13, 2013, her review of systems was stable except for respiratory symptoms, a physical examination still found no edema in her extremities, and Taylor was again advised to continue exercising regularly.  (Tr. 277).   On December 4, 2013, she presented to Angela White, N.P., at Dr. Steibel's office, with pain in her left shoulder and neck.  (Tr. 295).  She was found to have tenderness in her spine, but her motor skills were normal and she had full range of motion, although rotation to the left was painful.  (Tr. 296). Nurse White and Dr. Steibel's assessment listed hypertension, depression, and muscle spasm, yet no medications or instructions were provided to treat the muscle spasm.  (Tr. 296-97).   On February 19, 2014, Ghiath Bayasi, M.D., noted that Taylor's chief complaint was asthma and that she had been swimming for exercise.  (Tr. 275).  His primary diagnosis for her was asthma, but he also diagnosed her with chest pain and being overweight.  (Tr. 276).  As a result, his treatment plan was focused on treating her asthma, but he also indicated that she should continue to exercise.  (*Id.*).  He asked to see her back in six months.  (*Id.*).

A Biopsychosocial Assessment conducted on April 2, 2014 by Marilyn G. Graff, ACSW, reported that Taylor was in "good health."  (Tr. 335).  Graff found that Taylor's posture was erect, her gait was normal, and her motor activity was normal.  (Tr. 336).  Graff concluded that Taylor's general health was very good.  (Tr. 337, 390).  Two months later, on June 11, 2014, Taylor reported to Graff that she had no physical pain.  (Tr. 393).  On June 26, 2014, Taylor again reported to Graff that she had no pain; she rated it a zero on a scale of zero to ten.  (Tr. 392).  Although the following month Taylor reported to Graff that she was in pain, she only rated

it as a four out of ten.  (*Id.*).  On November 25, 2014, Michael R. Beer, M.D., found that a physical examination of Taylor's musculoskeletal system indicated that she had normal gait and station of her head and neck.  (Tr. 359).  On January 21, 2015, Taylor again saw Dr. Beer and denied having chronic back pain, chronic neck pain, sore muscles, numbness, tingling, and dizziness.  (Tr. 349).  On March 10, 2015, Taylor had a follow up visit with Mark Rittenger, D.O., for her asthma.  (Tr. 398).  Although she complained of back and joint pain, along with joint stiffness and swelling, she did not have decreased range of motion, muscle cramps, muscle weakness, myalgia, tremor, or weakness.  (Tr. 400).  Upon physical examination, Dr. Rittenger found that Taylor had no digital clubbing in her bilateral upper extremities and no edema in her bilateral lower extremities.  (Tr. 401).  He gave her instructions for treating her asthma – with no instructions for addressing her back and joint issues – and asked her to follow up with him in four months.  (*Id.*).

According to a record signed by Nurse White and Dr. Steibel, on March 25, 2015, Taylor had no muscle pain, no joint pain, no joint stiffness, no restriction of motion, and no weakness. (Tr. 439).  Nurse White and Dr. Steibel's assessment of Taylor on this date listed her having a body mass index of 36.0 to 36.9, an upper respiratory infection, and cough variant asthma.  (Tr. 439-440).  A later record by Nurse White and Dr. Steibel from May 13, 2015 again indicates that Taylor reported having no muscle pain, no joint pain, no joint stiffness, and no restriction of motion.  (Tr. 436).

On April 8, 2015, Taylor saw Melissa Kildow, ANP-BC, and Lisa L. Guyot, M.D., for low back pain, which on that day she rated as being a three out of ten.  (Tr. 405).  Taylor's review of systems notes joint problems, joint stiffness, and muscle problems; however, her physical examination results include that she ambulates without difficulty; has 2+ reflexes in the

biceps, triceps, brachioradialis, patella, and Achilles; has no clonus at the wrist or ankle; and has negative results for Hoffman, Kernig, and Brudzinski tests/signs.  (Tr. 406).  Nurse Kildow and Dr. Guyot concluded that "Romberg, supination, pronation, finger to nose and heel to knee [were] all intact."  (*Id.*).  They wrote that on inspection, Taylor's muscle bulk and tone were adequate.  (*Id.*).  They also found that Taylor had full range of motion in the lumbar and cervical spine, shoulders, and hips; negative straight leg raise test, Patrick's signs, and Spurling's signs; and no pain with palpation to any spinous muscles.  (Tr. 406-07).  Furthermore, Taylor's strength was 5/5 and equal bilaterally in the hamstrings, quadriceps, anterior tibialis, gastroenemius, dorsiflexions, plantar flexion, and extensor hallucis longus; she had no lower extremity edema or varicosities; and her pulses were 2+ and equal distally.  (Tr. 407).

In her motion, Taylor overlooks the ALJ's first reason for giving Dr. Steibel's opinion little weight and focuses exclusively on the ALJ's second reason.  She argues that a review of the record makes it "readily apparent that the ALJ's assertion that [her] condition never worsened is simply incorrect" and that remand is therefore necessary.  (Doc. #14 at 16).  In support of her argument, Taylor cites to a September 2014 X-ray, a February 2015 MRI, and a 2015 medical opinion suggesting that she have an epidural steroid injection and opining that she was potentially a candidate for surgery.[7]  (*Id.* at 15) (citing Tr. 342, 364, 407).  But the central issue

---

[7] As to this third piece of evidence, Taylor states that "it should be noted that [Taylor] was in fact ultimately required to undergo lumbar spine surgery just as her surgeons had expected."  (Doc. #14 at 15).  Taylor did eventually undergo back surgery on January 24, 2017 (Tr. 8-9); however, the Appeals Council determined that because this new evidence post-dates the ALJ's October 27, 2015 decision, "it does not affect the [ALJ's] decision about whether [Taylor] [was] disabled beginning on or before October 27, 2015."  (Tr. 2).  The law is clear that other than with respect to a possible sentence six remand, this Court may not consider new evidence submitted to the Appeals Council after the ALJ made her decision.  *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) ("[T]his court has repeatedly held that evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review.").  Here, Taylor makes no argument for remand under "sentence six" of the

in reviewing the ALJ's decision to give Dr. Steibel's opinion little weight is whether substantial evidence supports the functional limitations Dr. Steibel determined were appropriate for Taylor, and ultimately, whether substantial evidence supports the functional limitations imposed by the ALJ in the RFC.  As explained above, substantial evidence supports the ALJ's decision; the medical evidence in the record supports the ALJ's finding that Taylor was not as limited as Dr. Steibel found her to be.[8]  Whether or not there was some worsening[9] of Taylor's conditions over time does not alter this conclusion.  Thus, the case should not be remanded on this issue.

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## III.    CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [15] be GRANTED, that Taylor's Motion for Summary Judgment [14] be DENIED, and that the ALJ's decision be AFFIRMED.

Dated: July 5, 2018                              s/David R. Grand
Ann Arbor, Michigan                         DAVID R. GRAND
                                                         United States Magistrate Judge


**NOTICE TO THE PARTIES REGARDING OBJECTIONS**

---

Act.  *See* 42 U.S.C. § 405(g).  As a result, the Court has reviewed whether the ALJ's decision is supported by substantial evidence without considering this new piece of evidence.

[8] The ALJ noted in his decision that in January 2015, Taylor stated that "her work prior to her alleged onset date ceased due to a 'lay-off for her [and] other staff.'"  (Tr. 32).  Given that Taylor did not stop working due to her conditions and/or resulting functional limitations, this detail provides additional support for the ALJ's decision to give Dr. Steibel's opinion little weight.

[9] Even if Taylor can point to some evidence of worsening during this late-2014/early-2015 timeframe, as noted above, numerous pieces of medical evidence in the record from that same time period reflect normal, or only minimal, findings.  *See supra* at 23-24.

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 5, 2018.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
